**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| BAD ASS COFFEE COMPANY OF HAWAII, INC., a Utah corporation; | ) ) ) | **ORDER and MEMORANDUM DECISION GRANTING INJUNCTIVE RELIEF** |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 2:09-CV-452 CW |
| JH Nterprises, L.L.C., a Florida limited liability company; RICHARD C. COOK, an individual; MARIE S. NILES-COOK, an individual; and DOES I through X; | ) ) ) ) ) | |
| Defendants. | ) ) | |

Now before the Court is Plaintiff Bad Ass Coffee Company of Hawaii, Inc.'s ("BACH")

Motion for Preliminary Injunction against Defendants JH Nterprises, L.L.C., Marie Niles-Cook

and Richard C. Cook.  In considering this motion, the court held an evidentiary hearing, heard

oral argument and reviewed extensive briefing.  For the reasons below, the court GRANTS

BACH's motion and ORDERS the injunctive relief specified below.


**FACTUAL BACKGROUND**

BACH is a Utah corporation with its principal place of business in Utah.  BACH is a

franchisor of gourmet coffee stores, with franchisees located in Hawaii and North America.

BACH franchisees are licensed to use the trade names, service marks and trademarks of BACH

and to operate under the "BACH System."  Under the "BACH system," franchisees use BACH's

specially designed manuals, recipes, operating procedures and marketing concepts, including

business formatting, interior and exterior design, specifications for certain equipment and supply items, products, managements programs, standards, specifications, and other BACH-generated information that BACH considers confidential.  The BACH System was developed over the course of many years and involved BACH's investment of considerable time and money.  Because of that investment and marketing efforts, BACH has acquired valuable brand recognition, goodwill and customer loyalty.  BACH enters into franchise agreements with each of its franchisees.  It is BACH's standard practice to include a covenant not to compete with BACH following the termination of those agreements.

On February 26, 2003, BACH and JH Nterprises entered into the Franchise Agreement at issue here.  JH Nterprises is a limited liability company owned by Ms. Niles-Cook and managed by Mr. Cook.  Under the agreement, JH Nterprises was to run a BACH franchise in Jacksonville, Florida.  The term of the agreement was six-years.  At the time Defendants began operating their BACH franchise, neither Mr. Cook nor Ms. Niles-Cook had any prior experience owning or operating a coffee store.  Nor did either have any relationships with coffee suppliers or distributors.

In connection with the Franchise Agreement, Mr. Cook and Ms. Niles-Cook executed a personal guaranty in which they guaranteed the obligations of JH Nterprises *vis-a-vis* its BACH franchise.  Some months after that, Mr. Cook and Ms. Niles-Cook both separately entered into identically-worded agreements with BACH styled "Non-Disclosure and Non-Competition Agreement" (the "Non-Competition Agreements").

2

Defendants were represented by counsel during their negotiations with BACH concerning the terms of the Franchise Agreement, the Non-Competition Agreements and the related documents.  As a result of those negotiations, the Franchise Agreement into which the parties eventually entered was different in form and substance from the Franchise Agreement originally presented to Defendants by BACH.[1]

By entering into the Franchise Agreement, Defendants acknowledged and agreed to be contractually bound by numerous specific terms relevant to the injunctive relief here sought, including the following:

a.      The franchise term was for a fixed period of six years, unless earlier terminated pursuant to the terms of the Franchise Agreement or extended by the parties, and

b.      JH Nterprises acknowledged that valuable goodwill is attached to BACH's marks and the BACH System, and that it would use those marks and System solely and exclusively in the manner proscribed by BACH.

Of most relevance to the present order, the Franchise Agreement includes the following provision:

## ARTICLE XIII

## COVENANT NOT TO COMPETE

13.03   Upon termination or expiration of this Franchise Agreement for any reason, or transfer, repurchase or termination of Your rights hereunder and

---

[1] The Franchise Agreement also contains an arbitration clause, though that clause specifically allowed BACH to seek an injunction in court.  BACH and Defendants are currently engaged in parallel arbitration proceedings.

for a period of two (2) years thereafter, neither You, nor Your family, nor any of Your members, owners, partners, managers, officers or directors, if You are a corporation, limited liability company or partnership, shall, directly or indirectly, participate as an owner, operator, shareholder, director, partner, consultant, agent, employee, advisor, officer, lessor, lessee, franchisee or serve in any other capacity whatsoever or have any interest in or assist any person or entity in any business, firm, entity, partnership or company engaged in the sale or offering of products or services or using a business format which are the same as or similar to Ours or the System within the Territory or within three (3) miles of the Territory or any Bad Ass Coffee Co.™ franchise or business operation. You shall not divert or attempt to divert any business of or any customers of any Bad Ass Coffee Co.™ franchise to any other competitive establishment, by indirect or direct inducement or otherwise.

(Franchise Agreement at 21, attached as Ex. A to Compl.)

The Franchise Agreement defines "Territory" by stating "See Location Addendum and map attached hereto and by reference made a part hereof in the City of Jacksonville, County of Duval, State of Florida." (Id. at 1.) The "Location Addendum" to the Franchise Agreement does not distinguish between the boundaries of the City of Jacksonville and Duval County and the map is labeled "Jacksonville/Duval County Geographical Boundary." (Ex. C to Compl.) The definition refers to the location as "in the City of Jacksonville." The parties have not argued that the Territory extends beyond the city boundaries and there does not appear to be any substantial geographical difference for the covered area in any event. On that basis, the court finds that the parties intended the "Territory" to be limited to the city of Jacksonville only.

Additionally, the Franchise Agreement contain the following terms relating to the covenant not to compete:

13.05   The foregoing covenants, to the extent they apply following the termination or expiration of this Agreement shall survive the termination

4

or expiration of this Agreement and shall apply regardless of whether this Agreement was terminated by lapse of time, by default of either party, or for any other reason.

13.06   You acknowledge that Your violation or breach of the covenants and provisions of this Article XIII is likely to cause substantial and irreparable harm to Us and the BACH System.  You agree that the restrictions contained in this Agreement are reasonable and necessary for Our protection and the protection of other Bad Ass Coffee Co.™ franchisees.

13.07   If any of the restrictions of this Article are determined to be unenforceable because of duration, scope or coverage or otherwise, they will be reduced to that level which provides the greatest restriction, but which is still enforceable.  You and We agree that such restriction will be enforced to the fullest extent possible.

(Id. at 21-22.)

The Non-Competition Agreements include a covenant not to compete separate and

distinct from that contained in the Franchise Agreement, as follows:

3.    Principal will not, during the term of the Franchise Agreement, and any renewals thereof, and for two years thereafter, directly or indirectly in any capacity, without Franchisee's prior written consent, engage in a business, or plan for or organize a business, or have any financial interest in a business, which is competitive with or substantially similar to the business of the Bad Ass Coffee Company® franchise or any other Bad Ass Coffee Company® franchisee by becoming an owner, operator, officer, director, shareholder, partner, consultant, associate, employee, advisor, agent, lessor or lessee, representative or franchisee, or serve in any other capacity in any such business. . . . Without limiting the generality of the foregoing, the minimum area of competitive nature herein before referred to shall be that area within a ten mile radius of the Franchisee's place of business under the Franchise Agreement or any place of business conducted by a franchisee of Bad Ass Coffee Company of Hawaii, Inc., or an affiliate or company owned by Bad Ass Coffee Company of Hawaii, Inc., at the time of the termination of the Franchise Agreement.

(Non-Competition Agreement at 2, attached as Ex. E to Compl.)

The Non-Competition Agreements also contain the following relevant provisions:

5

1.      Principal acknowledges that he or she has obtained or may obtain knowledge of confidential matters and procedures developed and owned by Bad Ass Coffee Company of Hawaii, Inc., and made available to the Franchisee which are necessary and essential to the operation of the Franchise, without which information the Franchise could not efficiently, effectively and profitably operate. Principal further acknowledges that such confidential information was not known to him or her prior to the association with Franchisor.

5.      Principal will not, during the term of the Franchise Agreement and any successor franchise and for two years thereafter, directly or indirectly, contact any customer of Franchisee or Franchisor for the purpose of soliciting from any such customer any business that is the same as or substantially similar to the business conducted between the Franchisee and the customer or Franchisor and the customer.

6.      At the termination of the Franchise Agreement, Principal agrees to deliver to Franchisee [sic] (and will not keep in his possession or deliver to anyone else) Bad Ass Coffee Company of Hawaii, Inc. policies and procedures manual and any and all records, data, designs, photographs, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any such items belonging to Franchisor, or to Franchisee, its successors or assigns relating to The Bad Ass Coffee Company® Business.

7.      Principal hereby acknowledges and agrees that any breach by him or her of Sections 1 through 6 above, inclusive, will cause damage to Franchisee and Bad Ass Coffee Company of Hawaii, Inc., in an amount difficult to ascertain. Accordingly, in addition to any other relief to which the Franchisor may be entitled, Bad Ass Coffee Company of Hawaii, Inc., shall be entitled to temporary, preliminary and/or permanent injunctive relief for any breach or threatened breached by any or all Principals of any of the terms of Section 1 through 6 above, inclusive, without proof of actual damages that have been or may be caused to Franchisee or Bad Ass Coffee Company of Hawaii, Inc., by such breach.

(Id. at 1-2.)

JH Nterprises agreed that upon expiration, termination or non-renewal of the Franchise

Agreement, it would take all steps necessary to disassociate itself from the BACH System and

the franchise including, but not limited to: (1) removal of signs; (2) destruction of letterhead; (3)

6

changing of telephone listings, telephone numbers, Internet sites and web pages; and (4) assignment and transfer of telephone listings, telephone numbers and home web pages to BACH. (Franchise Agreement at 16.)  JH Nterprises further agreed that all of its members would be jointly and severally liable for performance on behalf of JH Nterprises in accordance with the terms of the Franchise Agreement.  (Id. at 26.)

Mr. Hill testified that BACH was not willing enter into the Franchise Agreement with JH Nterprises unless Defendants agreed to the covenants not to compete contained in the Franchise Agreement and the Non-Competition Agreements.  The parties performed under the terms of the Franchise Agreement for the six years it was in effect.

Neither party sought to renew the term of the Franchise Agreement, and the six-year term expired on February 26, 2009.  BACH did however, offer to allow Defendants to renew the Franchise Agreement without payment of an additional franchise fee.  The Defendants declined this offer.  Before the term ran, BACH's counsel sent Defendants a letter dated February 5, 2009 that cited Defendants' contractual obligations to BACH upon expiration of the Franchise Agreement.  BACH highlighted the covenants not to compete and warned Defendants of BACH's intent to take legal action if Defendants breached those provisions.  Defendants acknowledged receipt of that letter, but did not substantively respond.

In the months before the franchise term expired, Defendants planned and prepared to convert their BACH franchise store into an independent coffee store.  As early as January 2009, during the franchise term with BACH, Defendants began the following activities: searching for a new coffee distributor; selecting the name Java Cove for their competing coffee business;

7

ordering new signs for the business; preparing artwork and logos for their new store; developing and preparing a website for their new store; and notifying their employees that they would be changing from a Bad Ass Coffee Company store to their own coffee store.

Defendants did not notify BACH of their intention to open a competing coffee store or of their efforts during the franchise period to plan and prepare for the conversion of their franchise store into Java Cove.  Though BACH had the option of picking up Defendants' lease at the location of their franchise store within 45 days after the Franchise Agreement ended, BACH did not elect to do so.

On or about the day the franchise term expired, Defendants took down their BACH signs and put up new signs for Java Cove.  Defendants immediately began operating Java Cove at the same address and in the same space as their former BACH franchise store.  Defendants continue to operate Java Cove to the present time.

Java Cove is a coffee shop.  Among other things, Defendants sell at Java Cove coffee and espresso drinks (including specialty lattes), teas and light fare.  Until very recently, Java Cove sold Hawaiian kona coffee, which is the same type of coffee sold by BACH franchises.  For the past few weeks, Java Cove has been selling "fair trade" coffees that originates from places other than Hawaii.  Java Cove sells the same teas Defendants previously sold as BACH franchisees and obtains those teas from the same suppliers Defendants previously used.  Moreover, Defendants sell many of the same kinds of food items they previously sold as BACH franchisees. Further, Defendants sell many of the same specialty latte drinks they previously sold as BACH

franchisees.  Many of those drinks are sold by identical names and using identical or similar flavors used while Defendants were operating their coffee store as BACH franchisees.

Repeat customers are critical to the success of coffee stores like those operated by BACH and Defendants.  Ms. Niles-Cook testified that about of half of the regular sales in Defendants' store come from repeat customers.  Since converting their BACH franchise store to Java Cove, Defendants have been and continue to serve many of the same customers who previously patronized the BACH franchise store at the same location.  Most of Defendants' customers are drawn from an area extending roughly two miles around the location at which Defendants operate Java Cove.

Mr. Hill testified that one of BACH's present franchisees has expressed interest in opening a BACH franchise store in the territory in which Defendants previously operated their BACH franchise store and now run Java Cove.  According to Mr. Hill, that franchisee will not open a store in the territory as long as Defendants run Java Cove in the same territory.

At some point after Defendants started to operate Java Cove, BACH was notified of the store's existence.  After sending investigators to Java Cove to examine its operations, BACH filed the present action on May 15, 2009.  Concurrent with filing its complaint, BACH also moved for a temporary restraining order and the present preliminary injunction.  After finding that a temporary restraining order was not appropriate in this case, the court scheduled timely hearings on BACH's motion for a preliminary injunction.  That motion is now fully briefed, and the court has heard all the evidence it believes is necessary to make a well reasoned decision.

9

**ANALYSIS**

**I.      Preliminary Injunction Standards**

To obtain a preliminary injunction, a party must establish that four equitable factors

weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer

irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the

opposing party will suffer under the injunction; and (4) the injunction would not be adverse to

the public interest."  Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 562 F.3d

1067, 1070 (10th Cir. 2009) (citation omitted).

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear

and unequivocal."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir.1991)

(citation omitted).  Further, the injunctive relief requested by BACH is mandatory.  That is,

BACH seeks and order affirmatively requiring Defendants to stop operating Java Cove at its

present location.  Because mandatory injunctions are disfavored in the Tenth Circuit, BACH's

motion "must be more closely scrutinized" than other types of injunctions.  Schrier v. University

of Colo., 427 F.3d 1253, 1259 (10th Cir. 2005) (citation omitted).[2]  For the reasons below, the

court concludes that BACH has met this high standard here.

_____

[2] The court further notes that "preliminary motions that afford the movant all the relief
that it could recover at the conclusion of a full trial on the merits" are also disfavored.  Schrier,
427 F.3d at 1259 (citation omitted).  As BACH has pointed out, Defendants seem unlikely to be
able to answer in money damages here.  Consequently, it appears that as a practical matter the
enforcement of the covenants not to compete is about all that BACH can realistically expect to
gain in any further proceedings.  This consideration, while not controlling, also convinces the
court that this motion is subject to closer scrutiny than other kinds of injunctions.

**II.      BACH is Entitled to Injunctive Relief**

Before analyzing the disputed aspects of this motion, the court notes that the parties have stipulated to an injunction on several issues.  First, Defendants have stipulated to and the court finds appropriate entry of an injunction requiring Defendants to return to BACH all BACH policies and procedures manuals and any and all records, data, designs, photographs, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, and/or other documents or property belonging to BACH, including reproductions of any such items.

Second, Defendants have stipulated to and the court finds appropriate entry of an injunction requiring Defendants to provide BACH with proof that they have disassociated themselves from the BACH System and the franchise, including removing BACH signs, destroying BACH letterhead in Defendants' possession, and changing Defendants' relevant telephone listings, telephone numbers, Internet sites and web pages.  Further, Defendants have stipulated to and the Court finds appropriate entry of an injunction requiring Defendants to provide BACH with proof that Defendants have notified all suppliers, utilities, creditors and other concerned parties that Defendants are no longer affiliated with BACH or the BACH System.

Finally, Defendants have stipulated to and the Court finds appropriate entry of a permanent injunction prohibiting Defendants from using any BACH trademarks, trade names, trade dress or other intellectual property, and prohibiting Defendants from using or disclosing

any confidential or proprietary information relating to BACH and obtained by Defendants during the franchise term.

The main issue remaining before the court is whether Defendants should be allowed to continue to operate Java Cove at its present location.  Defendants argue that BACH is not entitled to shut down Java Cove at its present location.  BACH contends that the court should order Defendants to cease operations at Java Cove and to enter an injunction barring further breaches of the non-compete agreements.  The court sets out and considers the parties' arguments on this issue below.

### A.     BACH is Substantially Likely to Succeed on its Contractual Claims

The substantive claims at issue here are BACH's allegations of breach of contract and efforts to enforce the non-compete provisions of the Franchise Agreement and Non-Competition Agreements.  As discussed below, the court believes that BACH is substantially likely to succeeds on these claims.

As an initial matter, Defendants do not dispute that the Franchise Agreement is a legally binding contract.  On the other hand, Mr. Cook and Ms. Niles-Cook dispute that the Non-Competition Agreements are enforceable, arguing that there was a failure of consideration on BACH's part.  Specifically, Mr. Cook and Ms. Niles-Cook maintain that the consideration for the Non-Competition Agreements was BACH's grant of a franchise, but that the Franchise Agreement had already been entered into months earlier.

Mr. Cook and Ms. Niles-Cook do not, however, point to any legal authority for the proposition that the same consideration cannot be made for binding covenants set forth in

separate written documents.  Indeed, the Non-Competition Agreements state that they are part of the same transaction as the Franchise Agreement, and that the parties understood that Mr. Cook and Ms. Niles-Cook's willingness to enter the agreements was part of inducement to BACH to enter into the Franchise Agreement. (See Ex. to Compl. at 1.)  These recitals are bolstered by Mr. Hill's testimony that BACH would not have signed the Franchise Agreement without an understanding from Mr. Cook and Ms. Niles-Cook that they intended to sign personal non-compete contracts.  The fact that the written documents reflecting the complete agreement of the parties were not signed at the same time does not negate the true intent of the parties nor the exchange of consideration for the contracts and obligations undertaken as part of the same transaction.  Accordingly, it does not appear that Mr. Cook and Ms. Niles-Cook would be able to successfully argue that the Non-Competition Agreements are unenforceable for lack of consideration.

The court next considers whether the covenants not to compete comply with the legal requirements specified to such agreements.  While the parties chose Utah law to apply to the Franchise Agreement, it could be argued that either Utah or Florida law apply to the Non-Competition Agreements.  On the question of whether a covenant not to compete is enforceable, the question of whether Utah or Florida law controls is not important because Defendants' counsel conceded that the difference between the two is not substantial.  Under Utah law, a court is required to enforce a non-compete agreement if the party seeking relief can show: (1) the agreement is "supported by consideration," (2) there was no "bad faith" in contract negotiations, (3) the agreement is "necessary to protect the goodwill of the business" and (4) its is "reasonable

in its restrictions in terms of time and geographic area." Kasco Servs. Corp. v. Benson, 831 P.2d 86, 88 n1 (Utah 1992) (citation omitted).

The first, second and fourth prongs of this test are not difficult to resolve here and are essentially not in dispute. First, Defendants concede that the Franchise Agreement is supported by consideration and the court has found the same of the Non-Competition Agreements. Further, no bad faith has been alleged by Defendants in contract negotiations. Finally, Defendants do not argue that a time limit of two years and a radius of three miles of Jacksonville, Florida or of a BACH franchise store is unreasonable.[3]

The third prongs is disputed. BACH argues that the clauses protect BACH's goodwill and Defendants disagree on several grounds. As an initial matter, the court finds that there is a strong connection between BACH's ability to stop a former franchisee from competing and BACH's goodwill. From the testimony of Mr. Hill and the court's review of various cases about franchises, some discussed below, it is apparent that covenants not to compete protect a franchising company's goodwill. Among other concerns, and as discussed further below, the court finds that in this case, the Defendants' actions in opening Java Cove are likely to send negative messages about BACH to the market and to other BACH franchisees. For example, Defendants' overnight switch to Java Cove may signal to potential BACH customers that the Defendants lost faith in the BACH brand. To other franchisees, Defendants' actions might set an example that they can leave the BACH franchise and immediately start competing if they are

---

[3] While the Non-Competition Agreements contain a ten mile radius, BACH expressly limited the relief it sought to a radius of three miles.

unhappy with BACH.  Because of these and similar considerations, the court finds that enforcing

reasonable Non-Competition agreements protects BACH's goodwill.

Defendants do not seem to dispute that non-competes in general protect goodwill.

Instead, they contend that the clauses at issue fail to reasonably do so.  In support of this

argument, Defendants argue that the language of the covenants not to compete can be read to

restrict activities that are wholly unrelated to BACH's good will.  For example, say Defendants

wanted to open a gas station in Jacksonville, Florida.  If the court were to interpret the contract

language literally, the Defendants could not open a gas station there if it sold any kind of coffee

because coffee is the same or similar product to what BACH stores sell.  BACH, however, would

have no legitimate reason to stop Defendants from opening a gas station, even one that offers

coffee for sale.  Thus, Defendants conclude, the covenants not to compete are not reasonably

necessary to protect BACH's goodwill they should not be enforced.  In other words, Defendants

argue that in this case, the covenants are not enforceable because they would allow BACH to

prevent Defendants from operating a business in circumstances where there is no reasonable

necessity to protect BACH's goodwill.

But the court need not construe the covenants not to compete at issue here as

unreasonable.  In fact, in both Utah and Florida, courts avoid reading covenants not to compete in

a manner that would render them unreasonable.  In Utah, this proposition is bourne out in the

common law.  For example, in <u>System Concepts, Inc. v. Dixon</u>, 669 P.2d 421, 426-27 (Utah

1983), a defendant seeking to avoid a preliminary injunction enforcing a non-compete clause

argued that the clause did not state a specific geographic area in which competition was not

allowed, making the clause invalid.  The Utah Supreme Court disagreed.  In rejecting the

overbreadth argument, the court first observed that the "reasonableness of the restraints in a

restrictive covenant is determined on a case-by-case basis, taking into account the particular facts

and circumstances surrounding the case and the subject covenant."  Id. at 427 (footnote omitted).

The court then considered the defendant's activities and found that the potential market for the

defendant was limited to the United States and was rather small.  See id.  Accordingly, the court

reasoned that the clause was valid because the "breadth of the covenant is sufficiently limited by

specific activity restrictions," making an express limit unnecessary under the facts of that case.

Id.

> Similarly, in J & K Computer Sys., Inc. v. Parrish, 642 P.3d 732, 736 (Utah 1982), a

defendant sought to overturn an injunction that was based on a non-compete clause, arguing in

part that the covenant was too broad to be enforced.  In considering this argument, the court

quoted the entire clause.  See id.  The clause required that defendant pay a fee to the plaintiff if

the defendant worked for one of plaintiff's "current customers" after the defendant left plaintiff's

employ.  Id.  The court had previously found that defendant had worked for a "current customer"

after leaving the plaintiff.  See id.  With this in mind, the court expressly avoided deciding

whether the clause was too broad when considered in its entirety.  Rather, in upholding the

clause's validity, the court reasoned that "[w]e only need decide here, and we do decide, that the

covenant was enforceable as it related to 'a current customer' of the plaintiff."  Id.

> In contrast to Utah, Florida has a statute that controls on this issue.  Under that statute, if

a *prima facie* case can be made that a covenant not to compete is reasonably necessary but the

16

restraint is "overbroad," the court "shall modify the restraint" to make sure that it can be

enforced.  Fl. Stat. Ann. § 542.335(1)(c).  Accordingly, under either Utah or Florida law,

Defendants are unlikely to convince a court (or arbitrator) that the non-compete clauses at issue

here are unenforceable.  Following Utah law, the decision maker would likely limit itself to

considering whether Defendants' operation of Java Cove at its present location violates the

covenants not to compete.  Under Florida law, arguing overbreadth would not be fruitful, because

even if that argument won, it would merely result in a modification of the clause.

In a related argument, Defendants have asserted that any injunction that issues based on

the wording of the non-compete clauses at issue here would not be sufficiently specific as

required by Rule 65(d)(1)(C) of the Federal Rules of Civil Procedure.  But Rule 65(d)(1)(c) only

requires that the injunction describe the acts enjoined "in reasonable detail."  Given the nature of

BACH and its business model and the nature of Defendants' relationship to BACH, the court

finds that the language of the non-compete clauses give Defendants enough detail to know what

they are enjoined from doing.  For example, Defendants would know that they are not enjoined

from opening a gas station that sells coffee, but they will know that they cannot open another

store like Java Cove.

Having concluded that the non-compete agreements are valid, the next question is

whether BACH has shown that it is substantially likely to win on the argument that Defendants'

operation of Java Cove is a breach of those agreements.  There is little question that BACH has

done so.  First and most importantly, Java Cove is a coffee shop, which is BACH's business.

Further, Java Cove sells products that are the same or substantially similar to the products sold by

BACH and its franchisees.  These include gourmet-type coffee and espresso beverages, specialty lattes and drinks, teas and light fare.  Until only a few weeks ago, Java Cove sold Hawaiian kona coffee.  Defendants order their teas from the same suppliers they used as BACH franchisees.  Moreover, Java Cove is similar in decor and design to a BACH franchise.  The tropical theme of BACH remains at Java Cove, and most of the design fixtures at Java Cove are the same as those of Defendants' BACH franchise store.

It is not contested that Defendants have a financial interest in Java Cove.  Nor do Defendants deny that they are actively involved in the day-to-day operation of Java Cove.  Further, Ms. Niles-Cook acknowledged that Java Cove welcomes customers who used to visit Defendants' BACH franchise store.

Defendants' arguments that their operation of Java Cove do not breach the non-compete agreements seem destined to fail.  First, the court is unconvinced that Mr. Hill's puffery about BACH not having any competitors is a sound basis for finding that Java Cove is not competing with BACH.  While Mr. Hill clearly feels that the coffee BACH sells is unmatched in quality and is unique, other coffee selling franchises and coffee stores clearly compete with BACH.  Moreover, the court does not believe that the Canadian case cited by Defendants, Second Cup Ltd. v. Niranjan, Bus Franchise Guid (CCH) ¶ 7,397 (Ontario Sup. Ct. of Justice, 2007) would persuade a court or arbitrator otherwise.  First, it was decided under the law of Canada and it is unclear whether importing its reasoning here would be warranted.  Second, the Second Cup court held that there was no written contract controlling the contours of the non-compete agreement,

giving the court there more leeway to define the scope of prohibited activities.  Here, on the other

hand, the parties' agreement is in writing and is clear.

For all these reasons, the court concludes that BACH has met its heavy burden of

showing that it is substantially likely to prevail on its claim that Defendants have violated the

express terms of the Franchise Agreement and the Non-Competition Agreements by running Java

Cove.  In sum, based on the record before it, the court is convinced that BACH has shown that it

is likely to prove that the non-competition clauses at issue here are valid and enforceable, and

that the Defendants are in breach of them.

### B.      BACH Will Suffer Irreparable Harm if Not Granted this Injunction

The next prong BACH must establish to prevail on this motion is to show that it will be

irreparably harmed if any injunction does not issue.  "[A] plaintiff satisfies the irreparable harm

requirement by demonstrating 'a significant risk that he or she will experience harm that cannot

be compensated after the fact by monetary damages.'"  RoDa Drilling Co. v. Siegal, 552 F.3d

1203, 1210 (10th Cir. 2009) (citations omitted).  While arguing that "purely speculative" harm

may occur is not sufficient, showing that "significant risk of irreparable harm" is present will

meet the burden.  Id. (citation omitted).  Moreover, the court should determine if the harm is

likely to take place before a ruling on the merits.  See id.

As an initial matter, the court finds it significant that the Franchise Agreement

specifically states that a breach of the non-competition provisions will irreparably harm BACH.

Moreover, it is the "generally accepted position that breach of an exclusivity clause almost

always warrants the award of injunctive relief."  Dominion Video Satellite, Inc. v. Echostar

19

Satellite Corp., 356 F.3d 1256, 1262 (10th Cir. 2004).  Nonetheless, it is clear that BACH must

show more than a violation of the provisions alone to show irreparable harm.  See id.  As

discussed below, the court finds that BACH has done so here.

First, the majority of courts that have considered the question have concluded that

franchising companies suffer irreparable harm when their former franchisees are allowed to

ignore reasonable covenants not to compete.  Courts reaching this conclusion have found various

types of harm peculiar to the franchisor/franchisee relationship, most of which apply here.  For

example, in Quizno's Corp. v. Kampendahl, No. 01 C 6433, 2002 WL 1012997 (N.D. Ill. May

20, 2002), the court granted an injunction against a former Quizno's franchisee who, in violation

of a covenant not to compete with Quizno's, opened a sandwich shop at the same location where

his Quizno's shop had been located for five years.  In support of its finding of irreparable harm,

the court pointed out that because the location of the new shop had been a Quizno's location for

so long, "enforcement of the non-compete covenant is essential to allow time for the public to

stop associating [the new shop] with Quizno's."  Id. at *7.  The court also credited Quizno's

assertion that Quizno's "will not be able to reenter the market as long as [the new shop] is in

operation and will therefore lose sales, goodwill, and market presence it once had in the area."

Id.  Lastly, the court highlighted the concerns that the former franchisee's actions were a "willful

violation" of the franchise agreement and that failure to enforce the agreement "sends a message

to other franchisees that the Agreement does not protect Quizno's and may be disregarded at

will."  Id.  The court agreed that such a ruling could "threaten[] the Quizno's franchise system as

a whole."  Id.  See also Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc., 834 F. Supp. 683, 691 (D.N.J.

20

1993) (a non-compete clause in franchise agreements "is necessary to protect the good will" of

the franchisor) and O.V. Marketing Assocs., Inc. v. Carter, 766 F. Supp. 960, 966 (D. Kan. 1991)

("Courts have recognized certain interests attendant to a franchise that are protectible by

restrictive covenants, such as good will, trade secrets, or the ability to secure a new franchise in

the territory.") (citations omitted).

      The same considerations driving courts like that in Quizno's to find irreparable harm

apply here.  Java Cove is operating in a location where the Defendants' BACH franchise had

been located for the last six years.  Defendants' overnight switch to Java Cove may send the

message to potential customers that BACH endorses Java Cove, or that the Defendants no longer

stand by BACH.  Such messages are likely to erode BACH's goodwill in the marketplace.

Further, Ms. Niles-Cook admitted that many of her BACH franchise store customers are now

Java Cove customers.  Moreover, Mr. Hill testified that someone has shown interest in opening

another BACH franchise in Jacksonville, but will not do so if Java Cove is there to compete.

Finally, Mr. Hill testified that his franchisees are a close-knit community, and that he believes

that they are keeping a close eye on what happens here.  If the non-compete clauses at issue are

not upheld in this case, it would be reasonable to think that other BACH franchisees might be

emboldened to follow in Defendants' footsteps.

      It is undeniable that it would be difficult to ascertain the damages caused in these

situations.  For example, how would one determine the amount of a money award for giving

other BACH franchisees the impression that the Franchise Agreement could be broken at will?

How much goodwill has BACH lost, in dollars?  These are questions with answers that are

unduly challenging to answer.  It must also be noted that all of these non-speculative harms

began to occur or had a likelihood of occurring the moment that Defendants opened Java Cove.

Accordingly, the harms have occurred and/or will occur before this case is decided on its merits.

Finally, Ms. Niles-Cook has conceded that Defendants would not be able to pay any

significant judgment if BACH secured a damages award.  "Difficulty in collecting a damage

judgment may support a claim of irreparable injury."  Tri-State Generation and Transmission

Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986).  See also In

re Tabernash Meadows, LLC, No. 03-24392 SBB, 2005 WL 375660, *15 (Bankr. D. Colo. Feb.

15, 2005) (finding inadequate remedy at law when the "ability to collect a money judgment

against [a defendant] is speculative at best").  Accordingly, BACH's showing of irreparable harm

is strengthened by the real possibility that the Defendants could not answer in damages.  Based

on these considerations, the court is convinced that BACH has met the irreparable harm test here.

Defendants' arguments against finding irreparable harm do not prevail.  First, the court is

not persuaded by the cases Defendants cite finding that a breach of a non-compete clause in a

franchise agreement will not cause irreparable harm.  These cases include Noodles Dev., L.P. v.

Ninth Street Partners, LLP, 507 F. Supp. 2d 1030 (E.D. Mo. 2007), Athlete's Foot Brands, LLC

v. Whoooahh, Inc., No. 07-333, 2007 WL 2934871 (D. Idaho Oct. 5, 2007), and Bennigan's

Franchising Co., L.P. v. Swigonski, No. 3:06CV2300, 2007 WL 603370 (N.D. Tex. Feb. 27,

2007).  Those cases gave short shrift to the particular dynamics of the franchising relationship

and appear represent a minority position.

The court is also unconvinced by Defendants' contention that BACH's inclusion of a measure for liquidated damages in the Franchise Agreement precludes a finding of irreparable harm.  Neither party cited any controlling authority on this point, and courts have come to differing conclusions.  See, e.g., Neo Gen Screening, Inc. v. TeleChem Int'l, Inc., 69 Fed. Appx. 550, 554 (3rd Cir. 2003) (holding that liquidated damages clause did not prevent a finding of irreparable injury) and Harvey Barnett, Inc. v. Shidler, 143 F. Supp. 2d 1247, 1255 (D. Colo. 2001) (holding the opposite).  While the court agrees that there may be some circumstances in which a liquidated damages clause would make it clear that monetary damages are sufficient, this is not one of those cases.  As discussed above BACH's intangible assets, such as goodwill and the strength of its franchise, that have been or will be damaged by Defendants' breaches.  This type of damage is difficult to measure in money.  The court does not agree that the damages clause in the Franchise Agreement would be a reliable guide to attempt to do so.

Finally, Defendants contend that BACH's actions with respect to enforcing these and other of BACH's non-compete agreements militate against a finding of irreparable harm.  First, BACH admits that it did not exercise certain contractual rights that could have prevented this situation, such as taking over Defendants' lease within 45 days after the Franchise Agreement expired.  BACH was also willing to bargain for Mr. Cook's son to take over and re-brand Defendants' BACH franchise before the agreement expired.  Moreover, BACH has allowed a former franchisee to open a competing business.  Lastly, BACH has no formalized system to monitor whether former franchisees comply with non-compete agreements.

23

The court agrees that each of these considerations cuts against a finding of irreparable injury to BACH here.  But under the totality of the circumstances, the court does not find that these considerations ultimately defeat such a finding.  As for BACH's failing to exercise contractual remedies, the court does not find it unreasonable for BACH to have relied on what it believed to be a strong non-compete clause to prevent what the Defendants did here.  The court therefore declines to find that BACH should have spent the money to take over a lease and leave the space empty to ensure that Defendants would not open Java Cove.  As for BACH's allowing a former franchisee to compete and being open to negotiating with Mr. Cook's son, it is clear that businesses sometimes make compromises.  The court does not believe that making compromises necessarily mean that BACH meant to devalue, or has devalued, their non-competition agreements globally.  Finally, it is not clear why BACH should have to expend the resources to systematically check up on franchisees whose agreements lapse.  As mentioned, it is not unreasonable for BACH to rely on their former franchisee's commitments to abide by what BACH sees as valid non-compete agreements.  Moreover, Mr. Hill testified that current franchisees help BACH monitor stores that are leaving the franchise, and in this case, one source of information on Defendants' activities was a current franchisee in Jacksonville.

For these reasons, the court finds that BACH has shown that it will suffer irreparable injury if this injunction does not issue and that such harm has or will occur before a final hearing of the merits of this case.

C.      The Balance of the Harms Favors BACH

The court has already described the various types of harms that BACH is suffering or likely will suffer if the present injunction does not issue.  It is clear that Defendants will also be harmed if the requested injunction issues.  For example, Java Cove's employees will temporarily or permanently lose their jobs at Java Cove, Defendants' investment may be lost, and so on.  The court finds, however, that these harms are self-inflicted by Defendants.  After all, it was Defendants who chose to open Java Cove at its present location in the face of the covenant not to compete.  Defendants had several courses of action that could have taken that would have avoided or lessened these harms, but they did not.  And when a party knowingly takes actions that increase the potential for harm if an injunction is ordered against them, courts give those harms little weight in the balancing test.  See, e.g., Davis v. Mineta, 302 F.3d 1104, 1116 (10th Cir. 2002) (discounting "self inflicted" harms in balancing inquiry).  Courts balancing harms to former franchisees who violated non-compete agreements have similarly been unwilling to allow defendants to point to harms that they could have avoided by abiding by their contract.  See, e.g., Athlete's Foot Mktg. Assocs. v. Zell Inv., Inc., No. Civ.A. 00-186, 2000 WL 426186, *13 (W.D. Pa. Feb. 17, 2000) and Maaco Enters., Inc. v. Bremer, No. 98-CV-2727, 1998 WL 669936, *5 (E.D. Pa. Sept. 29, 1998).  Accordingly, while the court is not happy about issuing an order that likely means the loss of jobs and capital in these difficult economic times, it is inescapable that Defendants largely brought this on themselves.  The balance of harms therefore favors BACH.

**D.     An Injunction is not Against the Public Interest**

In support of their argument that an injunction would be against the public interest, the Defendants cite to the harms that would be faced by the Defendants and Java Cove's employees. But as mentioned, the Defendants' harms self-inflicted and are not properly considered as harms to the "public interest" anyway.

The court is sympathetic to the employees who are basically caught in the middle of this dispute.  It seems fairly certain that once Java Cove ceases to operate in its present location, those employees will have to start looking for new employment.  But unlike the plaintiff in ClearOne Commc'ns, Inc. v. Chiang, 608 F. Supp. 2d 1270, 1282 (D. Utah 2009), BACH has not requested an injunction that could potentially prevent Defendants' employees from "earn[ing] a living." Unless they are covered by the injunction for some reason (in which case their harm is more properly considered as part of the harm to the Defendants), the employees are free to seek to work for any employer, anywhere, any time.  And in any event, these employees would have had to look for new jobs if Defendants elected not to open Java Cove in violation of the non-competition agreements.  Beyond this concern for themselves and Java Cove's employees, Defendants do not offer any other possible way in which the public could be harmed if this injunction issues.  The court thus concludes that issuing the requested injunction will be not adverse to the interests of the public.

**E.     Security**

Under Rule 65(c) of the Federal Rules of Civil Procedure, a court should issue a preliminary injunction "only if the movant gives a security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully

enjoined."  Here, it appears that Defendants had been operating their BACH franchise at a loss,

and there is no indication that they have been any more successful with Java Cove.  Accordingly,

the court is convinced that it is appropriate for BACH to post a bond of $10,000.

## CONCLUSION AND ORDER

For all of the reasons discussed above, the court is convinced that BACH has carried its

heavy burden of showing that it is entitled to the injunctive relief it seeks here.  The court notes

that BACH's requested and proposed injunctive relief has not exactly tracked the language of the

Franchise Agreement and the Non-Competition Agreements.  Yet given that the contracts are the

only basis for the requested injunction, the court will not vary the language of these documents

except as stipulated.  Accordingly, the court ORDERS that the Defendants are preliminarily and

permanently enjoined as follows:

1.      Defendants must immediately return to BACH all BACH policies and procedures

        manuals and any and all records, data, designs, photographs, notes, reports,

        proposals, lists, correspondence, specifications, drawings, blueprints, sketches,

        materials, equipment, and/or other documents or property belonging to BACH,

        including reproductions of any such items.

2.      Defendants must immediately provide BACH with proof that they have

        disassociated themselves from the BACH System and the franchise, including

        removing BACH signs, destroying BACH letterhead in Defendants' possession,

and changing Defendants' relevant telephone listings, telephone numbers, Internet sites and web pages.

3.   Defendants must immediately provide BACH with proof that Defendants have notified all suppliers, utilities, creditors and other concerned parties that Defendants are no longer affiliated with BACH or the BACH System.

4.   Defendants are permanently enjoined from using any BACH trademarks, trade names, trade dress or other intellectual property.

5.   Defendants are permanently enjoined from using or disclosing any confidential or proprietary information relating to BACH and obtained by Defendants during the franchise term.

6.   Until the date of a final determination on the merits of BACH's claim for permanent injunctive relief, or until February 26, 2011, whichever is sooner, JH Nterprises, along with its members, owners, partners, managers, officers or directors, shall not, directly or indirectly, participate as an owner, operator, shareholder, director, partner, consultant, agent, employee, advisor, officer, lessor, lessee, franchisee or serve in any other capacity whatsoever or have any interest in or assist any person or entity in any business, firm, entity, partnership or company engaged in the sale or offering of products or services or using a business format which is the same as or similar to that of BACH or the BACH System within a three (3) miles radius of the City of Jacksonville, County of Duval, State of Florida or within a three (3) mile radius of any Bad Ass Coffee Co.™ franchise or

business operation.  Nor shall JH Nterprises along with its members, owners, partners, managers, officers or directors divert or attempt to divert any business of or any customers of any Bad Ass Coffee Co.™ franchise to any other competitive establishment, by indirect or direct inducement.

7.      Until the date of a final determination on the merits of BACH's claim for permanent injunctive relief, or until February 26, 2011, whichever is sooner, Mr. Cook and Ms. Niles-Cook shall not directly or indirectly in any capacity, without BACH's prior written consent, engage in a business, or plan for or organize a business, or have any financial interest in a business, which is competitive with or substantially similar to the business of the Bad Ass Coffee Company® franchise or any other Bad Ass Coffee Company® franchisee by becoming an owner, operator, officer, director, shareholder, partner, consultant, associate, employee, advisor, agent, lessor or lessee, representative or franchisee, or serve in any other capacity in any such business.  The ownership of not more than 2% of the voting stock of a publicly held corporation shall not be considered a violation of the foregoing provision.  Without limiting the generality of the foregoing, the minimum area of competitive nature hereinbefore referred to shall be that area within a three mile radius of 4352-1 South Side Boulevard, Jacksonville, Florida or any place of business conducted by a franchisee of Bad Ass Coffee Company of Hawaii, Inc., or an affiliate or company owned by Bad Ass Coffee of Hawaii, Inc. as of February 26, 2009.

8.     Until the date of a final determination on the merits of BACH's claim for permanent injunctive relief, or until February 26, 2011, whichever is sooner, Mr. Cook and Ms. Niles-Cook shall neither directly nor indirectly contact any customer that JH Enterprises serviced as a BACH franchisee or any customers of BACH for the purpose of soliciting from any such customer any business that is the same as or substantially similar to the business conducted between JH Enterprises and the customer or BACH and the customer.

9.     This injunction is directed and applies to each of the Defendants in this case as specified, together with their officers, agents, servants, family members, employees, attorneys and those persons or entities in active concert or participation with them who receive notice of this Order.

10.     Notwithstanding Paragraphs 1-9 of this Order, Defendants shall have until July 17, 2009 to wind down the affairs of Java Cove at its present location and to take all steps reasonably necessary to do so.  As of July 18, 2009, Defendants must cease operating Java Cove at its current location and confirm in writing to BACH that they have done so.

11.     Pursuant to Rule 65(c), BACH shall post with the court a bond or cash in the amount of $10,000.00 (Ten Thousand Dollars) on or before July 18, 2009.

DATED this 2nd day of July, 2009.

BY THE COURT:

_____

Honorable Clark Waddoups
United States District Court Judge